IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A MOTOROLA CELL PHONE, BLUE IN COLOR, WHICH WAS FOUND IN THE VEHICLE OPERATED BY BRAYAN ROBLES-OTERO AND SEIZED BY LAW ENFORCEMENT ON MARCH 16, 2022. THE DEVICE IS CURRENTLY LOCATED AT COLUMBUS DIVISION OF POLICE SECURE PROPERTY ROOM | Case No. 2:22-mj-198 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Homeland Security Investigations (HSI) Special Agent (SA) Clark S. Powers (your affiant), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

Your affiant submits this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one red Apple iPhone—which is currently in law enforcement possession, and the extraction from the cellular telephone of electronically stored information described in Attachment B.

1. Your affiant has been employed by HSI since December 2016, having been assigned to our Sells, Arizona office. During that time, your affiant was assigned to the Sells Border Enforcement and Security Task Force (BEST), which focused on human, narcotics, bulk cash, and weapon smuggling occurring between Ports of Entry (POE) and the Phoenix, Arizona metropolitan area. Beginning in October 2020, your affiant was assigned to the HSI Columbus, Ohio office, as a participating member of the Central Ohio High Intensity Drug Trafficking Area (HIDTA) multi-agency task force. Your affiant gained experience through a Bachelor of Arts Degree in Criminal Justice in 2007, completion of the Federal Criminal Investigator Training

Program (CITP) and completion of the HSI Special Agent Training Academy in 2017. During CITP and the HSI Academy training, your affiant was instructed in all phases of criminal investigation such as: Criminal Law, Search and Seizure, Field Enforcement Techniques, Firearms Proficiency, and Interviewing and Evidence. Your affiant is responsible for enforcing federal criminal statutes including, but not limited to, controlled substance violations, pursuant to 21 U.S.C. §§ 841 and 846.

2. Through both training and experience, your affiant is familiar with narcotics traffickers' methods of operation including the importation, distribution, and transportation of illegal drugs, the collection of money, and money laundering. Your affiant has executed, or participated in the execution of, numerous search warrants and seized evidence of these violations.

3. Your affiant has experience in conducting criminal investigations of violations of Title 21 (controlled substance statutes) and Title 19 (customs statutes) of the United States Code. Based on your affiant's experience, training, and conversations with HSI Special Agents, DEA Special Agents, United States Postal Inspectors, and HSI Task Force Officers, your affiant has observed and learned that narcotics trafficking organizations utilize several methods to insulate their illegal activities from law enforcement detection. These methods are common to major narcotics trafficking organizations and vary in levels of sophistication.

4. Through training and experience, your affiant knows drug trafficking organizations commonly use electronic devices, cellular telephones, and radio telephones in an attempt to maintain secure communications between network members and customers. They use these devices during the commission of their criminal activity and the events preceding and following such activity for the following reasons:

a) They use cellular telephones to arrange, coordinate, and monitor smuggling activities including communicating with other smugglers, arrangers, and other transporters/drivers to coordinate narcotics loads. They also use cellular telephones to communicate with these same individuals during counter-surveillance activities, and to warn co-conspirators of the presence of law enforcement or other obstacles to their smuggling plans.

b) They use cellular telephones to contact financial institutions where they launder their proceeds or receive monies for payment for their roles in the scheme, as well as to contact individuals who sell/rent real estate, vehicles, or other facilities the smuggler uses to conduct illegal activities.

c) They use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communications, direct dial, push-to-talk, email, internet access, communication applications, encrypted communications, photo and video images, and contact lists containing information about their criminal associates to accomplish their illicit activities.

d) They use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

5. Your affiant is investigating an organized group of individuals, some known and unknown currently, including **Brayan ROBLES-OTERO (hereafter referred to as ROBLES-OTERO)**. The organization is suspected of conspiring to distribute and possess with intent to distribute acetyl fentanyl and methamphetamine, in violation of 21 U.S.C. §§ 846.

6. The facts in this affidavit are based upon your affiant's personal observations, training and experience, and information obtained from other agents and witnesses. This

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all your affiant's knowledge about this matter.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. §§ 846 (conspiracy to distribute and possess with intent to distribute more than 400 grams of acetyl fentanyl and more than 500 grams of methamphetamine) has been committed by **ROBLES-OTERO**. There is also probable cause to believe evidence relating to the above criminal violation under investigation, including the users of the cellular telephones and information about both known and unknown co-conspirators, will be stored on, or tied to the cellular telephones. There is probable cause to believe that the use of the investigative technique described by the warrant will result in investigators learning this information.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched is a Motorola cellphone, blue in color, which was found in the vehicle operated by **Brayan ROBLES-OTERO and** seized by law enforcement on March 16, 2022. The device (hereafter referred to as **"Target Phone"**) is currently located at the Columbus Division of Police Secure Property Room.

9. The applied-for warrant would authorize the forensic examination of **Target Phone** for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

10. On March 16, 2022, your affiant was contacted by HSI New York City/JFK Border Enforcement Security Task Force (BEST), regarding a United Parcel Service (UPS) package which was delivered to an address in Columbus, Ohio. The characteristics of the package matched the characteristics of narcotics laden packages which they had previously seized.

11. On or about March 15, 2022, an unknown individual shipped a UPS parcel (Target Parcel) from The UPS Store located at 1027 South Rainbow Boulevard, Las Vegas, Nevada 89145, next day air to 84 Meek Avenue, Columbus, Ohio 43222. The sender was listed as Orlando Pena, utilizing phone number (702) 801-1054, with a listed return address of 2400 East Evans Avenue, North Las Vegas, Nevada 89030. The recipient was listed as Martin Ortega Sanchez at 84 Meek Avenue, Columbus, Ohio 43222. The UPS tracking number was listed as 1ZR27Y560112201814. Utilizing a source of information, your affiant learned that the 84 Meek Avenue residence is operated as an accommodation for travelers on the website Airbnb.com. The 84 Meek Avenue residence was rented to an individual from Perris, California from March 11, 2022, through March 18, 2022.

12. Based upon your affiant's training, experience, investigative trends, and conversations with other Special Agents and law enforcement officers, it is common for drug trafficking organizations (DTO) to utilize short-term rental properties, hotels, and mailbox stores to facilitate the trafficking of illegal narcotics and contraband. These methods minimize the DTO's residence from being compromised during the investigation and give the appearance of a legitimate parcel consignee address.

13. HSI Special Agents and Task Force Officers observed a blue Nissan Sentra (hereafter referred to as Target Vehicle, bearing Nevada license plate 917T34, registered to Las Vegas resident Pablo OBERO (hereafter referred to as OBERO), arrive at the 84 Meek Avenue residence. A Hispanic male, later identified as Brayan Alejandro ROBLES-OTERO (hereafter referred to as ROBLES-OTERO), entered the residence and retrieved luggage and a box matching the characteristics of a UPS parcel, which he placed in the trunk of the Target Vehicle. ROBLES-

OTERO then locked the 84 Meek Avenue residence and traveled to the John Glenn International Airport.

14. Upon arrival at the airport, HSI Special Agents and Task Force Officers maintained constant surveillance on the Target Vehicle. Investigators observed ROBLES-OTERO park the Target Vehicle in the short-term parking deck before entering the airport terminal. Investigators contacted an airport police K-9 handler and requested an open-air sniff of the Target Vehicle. The K-9 alerted to an odor he is trained to detect emanating from the trunk of the Target Vehicle.

15. HSI Special Agents and Task Force Officers located ROBLES-OTERO attempting to board an American Airlines flight from Columbus, Ohio to Charlotte, North Carolina, with a destination in Washington D.C. Investigators determined that ROBLES-OTERO had the key fob associated with the Target Vehicle in his possession. ROBLES-OTERO was detained at that time, until a search warrant for the Target Vehicle could be secured.

16. A search warrant was executed on the Target Vehicle. During the search, a box bearing the same UPS shipping label information obtained from HSI JFK was recovered from the trunk. Upon opening the box, two brick shaped objects were found wrapped in black packing tape. Upon examining the brick substance, it was determined to be white and granular in nature. The substance field tested positive as acetyl fentanyl (an analogue of fentanyl). Six additional packages wrapped in black packing tape were in the box. The substance appeared crystalline in nature and field tested positive for methamphetamine. **Target Phone** was located in the vehicle's trunk during the execution of the search warrant.

17. Upon locating the suspected narcotics, HSI Task Force Officers advised ROBLES-OTERO of his Miranda rights and placed him under arrest. ROBLES-OTERO agreed to speak with investigators on scene in order to gather additional information. ROBLES-OTERO admitted to

investigators that he knew boxes which contained drugs were within the Target Vehicle he had operated prior to his arrival at the airport. ROBLES-OTERO was then transported to the Columbus Division of Police Headquarters, located at 120 Marconi Boulevard, Columbus, Ohio 43215 for additional questioning.

18. Your affiant, along with Columbus Police Department (CPD) Detectives James Walker and Vicente Uriostegui conducted an interview of ROBLES-OTERO. CPD Detective Uriostegui is a native Spanish speaker and provided translation for ROBLES-OTERO. ROBLES-OTERO was reminded of his Miranda warnings and agreed to speak with investigators. During the interview, ROBLES-OTERO stated that he worked with Pablo OBERO (OBERO) the registered owner of the Target Vehicle to receive narcotics laden parcels at the 84 Meek Avenue residence. ROBLES-OTERO stated OBERO is a resident of Charlotte, North Carolina, and that OBERO had departed Columbus for Charlotte earlier in the day on March 16, 2022. ROBLES-OTERO was instructed to leave the Target Vehicle at the airport. ROBLES-OTERO would then fly to Charlotte with the keys of the Target Vehicle, which he would give to OBERO before leaving for Washington D.C. ROBLES-OTERO stated OBERO would then return to Columbus with the keys to the Target Vehicle in order to retrieve it and the narcotics concealed within. When asked about **Target Phone**, ROBLES-OTERO explained that the phone was given to him by OBERO.

19. While your affiant conducted the interview, HSI Special Agents and Task Force Officers executed a search warrant of the 84 Meek Avenue residence. Empty boxes were found in the basement of the residence, which ROBLES-OTERO identified as previous narcotics shipments. No additional narcotics or illicit drug proceeds were in the residence.

20. ROBLES-OTERO stated he was never paid for these trips. ROBLES-OTERO did state that he provided his Mexican identification to OBERO on several occasions. OBERO allegedly used ROBLES-OTERO's identification to wire illicit funds to Mexico.

21. **Target Phone** is currently in the custody of the Columbus Police Department, which is within the Southern District of Ohio.

22. Probable cause exists to believe that **Target Phone** may contain evidence identifying: (1) cellular telephone numbers used by drug trafficking associates; (2) telephone calls conducted with drug trafficking co-conspirators (including time, date, and duration of calls); (3) photographs of and/or with drug trafficking co-conspirators, illegal controlled substances, and/or currency; (4) text and/or voicemail message communications (including time and date) with drug trafficking associates; (5) electronic mail and social media internet sites accessed by the users of the devices; (6) usernames and/or passwords utilized by the users of the devices to access electronic mail and social media internet sites; and (7) addresses, locations, and locations frequented by **Target Phone**.

23. Based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that drug trafficking organizations utilize cellular telephones (such as **Target Phone**) to communicate when conducting their illegal activity, utilizing the voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so. These devices are utilized in furtherance of the crime by coordinating the transport and distribution of controlled substances, the tracking of narcotics laden mail parcels, the collection and movement of currency, as well as communicating with members of the drug trafficking organization about the specific operations of that organization.

24. Further, based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that individual members of drug trafficking organizations often carry and utilize more than one cell phone per person at a time. It is common practice for these individuals to use different phones or various phone applications to communicate with different members of the drug organization. This helps insulate individuals from being linked to the greater conspiracy if one member is caught by law enforcement. Additionally, when communicating with drug trafficking organizations based in Mexico, it is common to see phones or SIM cards that are solely used to communicate with the individuals in Mexico, and phones or SIM cards solely used to communicate with individuals in the United States.

## TECHNICAL TERMS

25. Based on training and experience, your affiant uses the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to

that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

26. Based on your affiant's training, experience, and research, your affiant knows that **Target Phone** has capabilities that allows it to serve as a wireless telephone, digital camera, and GPS navigation device. In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, items that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Target Phone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Target Phone** because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of **Target Phone** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. Your affiant submits that this affidavit establishes probable cause for a search warrant authorizing the examination of **Target Phone** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Clark S. Powers
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on March 22, 2022:

Chelsey M. Vascura
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched includes the device identified in the Affidavit as:

a) A Blue Motorola Smart Phone (hereafter referred to as "**Target Phone**"), found in the trunk of the vehicle operated by Brayan Alejandro ROBLES-OTERO, and seized by law enforcement on March 16, 2022. **Target Phone** is currently located at the Columbus Division of Police Secure Property Room.

This warrant authorizes the forensic examination of **Target Phone** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the device described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(A)(1)(vi) and involve Brayan Alejandro ROBLES-OTERO including:

   a. Any contact made either by call, text message, email, or third party application between any of the seized devices or other parties currently unknown to law enforcement at this time. Third party applications may include (but are not limited to):

      i. KIK Messaging App
      ii. BlackBerry Messenger (BBM)
      iii. What's APP
      iv. Signal
      v. Tango
      vi. Facebook Messenger
      vii. Group Me
      viii. Voxer Messenger
      ix. Yahoo Messenger
      x. Google Maps and other Mapping applications

   b. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. Any information related to sources or distributions of drugs (including names, addresses, phone numbers, pictures, or any other identifying information);

   d. Any information recording Brayan Alejandro ROBLES OTERO's schedule or travel;

  e. All bank records, checks, credit card bills, account information, and other financial records that may reveal evidence of drug and/or money laundering; and

  f. Evidence of user attribution showing who used or owned each device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.